# West Hickory Mining Association *versus* Reed.

1. Brown contracted with Manross for sale of land and died, leaving a widow and children, having made no provision for the execution of the contract. The Orphans' Court, on the application of his administrators, with the consent of record of Manross, decreed specific execution, and they conveyed to Manross. *Held*, that the decree was conclusive under the Act of February 24th 1834, sect. 15, although there was no notice to the widow or heirs.

2. By contract for sale of land the estate of the decedent is converted into personalty, over which his personal representatives have absolute control.

3. A widow and heirs are not entitled to specific notice of an application for an order of sale for the payment of debts.

4. Where the application for specific execution of a contract for sale of land is by the administrators, &c., of a decedent, notice to the widow and heirs is not necessary.

5. When land is brought into a partnership as stock, it is, as between the partners, their creditors and one who has knowingly dealt with them for it, personalty belonging to the firm.

6. General references to dockets and entries scattered through a record are not a compliance with the rules relating to specification of errors; the specific items should be embodied in the assignments.

7. Anshutz's Appeal, 10 Casey 375; McKee *v.* McKee, 2 Harris 231; Sutter *v.* Ling, 1 Casey 466, distinguished.

October 19th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, PAXSON and WOODWARD, JJ. GORDON, J., did not sit on this case, having been interested as counsel.

Error to the Court of Common Pleas of *Venango county*, No. 180: Of October and November Term 1874.

This was an action of debt, brought December 4th 1871, by The West Hickory Mining Association against William Reed, to

recover the purchase-money of a tract of land under the following agreement :—

"This agreement between the West Hickory Mining Association, of the first part, and William Reed, witnesseth, That the said Mining Company have agreed to sell to said Reed one hundred acres of west ends of lots one and two of their lands on West Hickory, as laid out, for the sum of eleven thousand dollars : five thousand to be paid by said Reed on the 1st of January 1871, when a good and acceptable deed is to be made to said Reed, by said company, for said one hundred acres, and the balance, six thousand dollars, to be paid on the 1st of May 1871, secured by bond and mortgage. Witness our hands and seals, this 15th day of October 1870."

The defence was that the plaintiffs could not convey a marketable title to the land contracted to be sold.

The land in question, on the 15th of August 1854, was owned by James Hulings. On that day, Hulings conveyed to R. J. Brown of Venango county. On the 5th of January 1856, Brown entered into articles of agreement with John Manross, by which, for the consideration of 560,000 feet of lumber, he sold to Manross a tract of land of 500 acres, of which that in question is part, Manross to deliver 50,000 feet on the 1st of September 1857; 30,000 feet on the 1st of January 1857, and the same amount annually thereafter till all should be delivered; Brown agreeing "that on the last payment being made, he will make over to Manross such titles as he has to said tract of land," &c.

It appeared that at this time Brown was in partnership with W. W. Wallace, as Wallace & Brown. On the 28th of August 1856, by an agreement of that date, the partnership was dissolved, and in consideration of $1000, Brown sold and assigned to Wallace all his interest in the firm, &c., including all claims, &c., due the firm. A statement accompanying the agreement contained, amongst others, this item, "Due on Manross place $5000." The following clause also was in the agreement :—

"N. B. All the property of the above description in Venango, Warren, or any other county of the state of Pennsylvania, or elsewhere, is also included in this agreement; all the real estate of every kind also to be delivered up without delay to said Wallace, and the deeds and titles made out in his name."

Brown died intestate May 3d 1862, leaving a widow and a number of minor children. Administration of his estate was granted to J. A. Neill and J. B. Stone.

Manross having paid to Wallace the balance of the purchase-money under his contract with Brown, Wallace, on the 26th of November 1864, conveyed the land to him.

On the 2d of November 1864, the administrators of Brown presented a petition to the Orphans' Court of Venango county, set-

[West Hickory Mining Association *v.* Reed.]

ting out, that on the 5th of January 1856, Brown, by contract in writing, bound himself to convey to Manross 500 acres of land, &c., for the consideration of 560,000 feet of lumber, in annual payments, as set out in the contract, deeds to be delivered to Manross upon his making the last payment; it further set out that Brown, on the 28th of August 1856, sold and assigned to Wallace, all his right, &c., to the lumber, "being the consideration due from Manross to said Brown;" that Manross had fulfilled his contract with Brown by paying Wallace the full amount of the purchase-money, but that Brown had died seised of the land without having made provision for the performance of the contract. The prayer was for "a decree for the specific performance of the contract."

Appended to the petition was the following :—

"And now, December 2d 1874, John Manross, the respondent, by his attorneys, appears and confesses the facts set forth in the foregoing petition, and joins in the prayer of the petitioners.

HEYDRICK & SNOWDEN, attorneys for respondent."

The record shows the following :—

"December 2d 1864, citation awarded, returnable to next term.
BY THE COURT."

"And now, December 2d 1864, the respondent having appeared and confessed the facts set forth in the petition, the court, upon consideration of the bill and answer, do adjudge the same, sufficient proof of the contracts annexed, and order and decree that the contract be specifically performed, and that the administrators execute and deliver a deed to the purchaser.
BY THE COURT."

On the 17th of December 1864, the administrators, &c., of Brown, in pursuance of the decree, made a deed to Manross, and on the 6th of January 1865, Manross conveyed to William T. Neill and John Wilson. About January 6th 1865, Neill and Wilson sold to Alfred Nevin and David Gilbert a large tract of land, including that in question; and Nevin and Gilbert agreed to convey to the plaintiffs, who went into possession.

On the 9th of November 1870, Wilson and Neill entered into a written contract with the plaintiffs in this suit. The contract recited the pendency of an ejectment, by Neill and Wilson against Gilbert and others, and the plaintiffs in this suit, to recover possession of 1200 acres of land, "known as the John Manross farm ;" and by it, Neill and Wilson agreed to sell and convey to the plaintiffs the land mentioned in the agreement, for $30,000, payable in instalments, the deed to be made on the second payment; the last payment to be made January 10th 1873; the vendors to release such lots as the vendees might sell upon the payment of a sum equal to $75 per acre in discharge of the purchase-money; the vendees (plaintiffs here) to assign to the vendors the contract with

Reed, the defendant, for the sale of 100 acres of the land, and the vendors to make a deed to Reed for the 100 acres, upon his payment of the purchase-money, as provided in his agreement with plaintiffs.

On the 30th of January 1870, Neill and Wilson executed and delivered to the plaintiffs a quit-claim deed for the land.

The case was tried April 13th 1874, before Trunkey, P. J.

The foregoing facts were given in evidence. The plaintiffs gave evidence also, by R. C. Brodie, their president, of the tender to defendant of a deed of the premises from them to him, and also of a quit-claim deed from Neill and Wilson to defendant; also that the defendant declined to receive them and pay the $5000, and execute a mortgage for the balance of the purchase-money; and conversations between witness and defendant at the time of the tender, as to where he could ascertain the title to the property, &c.; also evidence tending to show that the defendant went into possession of the land about the time of the execution of the contract of sale.

The plaintiffs then rested.

The defendant offered in evidence the exemplification of an action of ejectment, brought in 1869, by Neill and Wilson against the plaintiffs and others, for lands, including that in controversy, in which there was a conditional verdict for Neill and Wilson, the plaintiffs in the ejectment, on December 26th 1870, for $53,428.

The offer was objected to, because the title to the land was in the plaintiffs in this suit; the offer was admitted, and a bill of exceptions sealed.

The defendant then offered in evidence the depositions of Joseph B. Stone and Juliet S. Brown, the widow of Robert J. Brown, taken upon commission. The depositions were objected to by the plaintiffs, because the matter proved in reference to the deed of Mrs. Brown was between other parties; and because some of the interrogatories were leading, and objections to them were filed before the testimony was taken.

The depositions were admitted and a bill of exceptions sealed.

Mrs. Brown testified that J. A. Neill, one of the administrators of her husband, wrote letters to her brother which were shown to her, in reference to getting from her a quit-claim deed of her interest as widow, in the premises. The object of the letters was to obtain her signature to a quit-claim deed. Neill represented that suit was about to be commenced against the purchaser of the land and it would be necessary to have a clear title, which they could not give without a quit-claim deed from witness, or an order from the court, which they could obtain, and that they preferred paying her to paying the court; that they had a title which had some informality that could be rectified by the court, but they preferred a deed from witness; that it would take time

[West Hickory Mining Association *v.* Reed.]

and would cost $25. Witness did not then know that she had any title in the land, and said at the time if she had she would not like to make the deed ; she supposed the land had been sold by Wallace & Brown, that firm having been dissolved ; she made the deed supposing it to be for the benefit of W. T. Neill and J. Wilson; she supposed the court could have made the deed without her sanction, and it would be no interest to her not to do it.

The testimony of Stone was to the same effect as to the representations of Neill in letters to him.

For the plaintiffs, in rebuttal, evidence was given for the purpose of showing that there was no fraud practised on Mrs. Brown in procuring her quit-claim deed.

Alexander Wallace testified that the Manross land, which Brown had a claim upon, was partnership property of Wallace & Brown ; they had furnished supplies to Manross and built him a saw-mill; he gave the property as security ; when they were paid it was to go back to Manross; there were no other funds ; Brown said the property was bought from Hulings with partnership funds ; there were about $5000 against Manross.

The following are plaintiffs' points with their answers :—

1. The title tendered in this case was sufficient, primâ facie, and conveyed such a title to the property sold to the defendant as he was bound to accept.

Answer. "The title of the plaintiffs, as shown, is, primâ facie, good. If not marketable, if such as likely to expose the holder to the hazards of litigation, he was not bound to accept it."

4. Under all the evidence in this case the plaintiff is entitled to recover.

"Answered in the negative."

The defendant's second point and its answer were :—

Upon the whole evidence the case is not such as would entitle the plaintiffs to specific performance, and the verdict should be for defendant.

Answer. "If you find the facts as called to your attention in the charge, viz.: That the defendant, at and before the interview with Brodie, was notified where he could inquire concerning the title, that at said interview he was not satisfied with the title and took time to examine it, till the 1st of May, that the plaintiffs did nothing in the meantime, and the defendant on the 8th of May 1871, notified the plaintiffs he would not accept the title and take the land, and that he never took possession, then this point is answered in the affirmative, otherwise the plaintiffs are entitled to recover."

The court charged :—

* * * "The plaintiffs have shown that the title was vested in R. J. Brown. Brown died intestate. The administrators of his estate presented a petition to the Orphans' Court for leave to

[West Hickory Mining Association *v.* Reed.]

prove the contract made by the decedent for the sale of the land to John Manross, and praying a decree of specific performance. Manross appeared at the same time and admitted the facts, and forthwith a decree for specific performance was made. In pursuance of this the administrators executed a deed. This deed is primâ facie good against the heirs of the decedent. In the proceedings in the Orphans' Court no notice was given to the widow and children. Unless the heirs had no right to be heard they may yet bring an action and show cause why the decree should not have been made. A party entitled to a hearing cannot be deprived of his rights by a proceeding in the Orphans' Court of which he had no notice. If heirs are not entitled to notice in a proceeding commenced by the administrators for proof of contract, joined in by a real or pretended purchase, then they have no right to a hearing. Then they have no right to a day in court to show that the alleged contract is void for fraud or other cause, or that in equity the purchaser is not entitled to a decree of specific performance. I do not think that the Act of Assembly intends that the decree shall be final against the heirs when made without notice to them. No cause has been cited where it was held to be final. The doctrine in some cases, and the intimation of several judges, including some of the Supreme Court, is, that the heirs are entitled to notice. That where a decree has been made without notice to them, though the title is primâ facie good, they are not barred from showing cause to defeat it : Sutter's Heirs *v.* Ling, 1 Casey 466.

"The proceedings of the Orphans' Court lay in the course of the plaintiffs' title, and on their face show that the heirs of Brown had no notice. In my opinion, a purchaser entitled to an acceptable title is not bound to take one where the heirs of a former owner could bring an action and recover against the primâ facie title by showing that it never ought to have been made. If the vendee chose to take a decree without notice to the heirs, accept a title that may be contested by them, it does not follow that the purchaser is bound to accept it. * * *

"You will observe that we submit to you nothing in reference to the quit-claim deed by the widow of R. J. Brown. The evidence upon that is withdrawn from your consideration. In our instructions we predicate nothing of what is urged against the validity of her quit-claim of dower. It may be inferred that this matter has been hunted up since the beginning of this suit, and that it did not enter into the cause for rejecting the title at the time it was done. Then it appeared good. We prefer to dispose of the cause, and submit it without any consideration of the attack upon that deed." * * *

The verdict was for the defendant.

The plaintiffs took a writ of error and assigned for error :—

[West Hickory Mining Association *v.* Reed.]

1, 2. Admitting the evidence mentioned in the bills of exception.

3. The portion of the charge of the court above given.

4, 5. The answers to the plaintiffs' points.

6. The answer to the defendant's point.

*Guthrie & Byles*, *Neill & Neill* and *B. J. Reid*, for plaintiffs in error, referred to Act of February 1834, Pamph. L. 75, sect. 15, 1 Br. Purd. 276, pl. 10. Where the application for specific performance is by the executor or administrator of the vendor, notice is required only to the purchaser : Sutter *v.* Ling, 1 Casey 466 ; Anshutz's Appeal, 10 Id. 375. Executors and administrators are representatives of the real assets, not of the heirs : Hays *v.* Shannon, 5 Watts 548 ; Horner *v.* Hasbrouck, 5 Wright 169.

Under the previous Acts of Assembly on this subject, no notice was required to heirs ; the decree to executors or administrators to make the deed was final : Meanor *v.* McKowan, 4 W. & S. 303 ; Riddlesberger *v.* Mentzer, 7 Watts 141 ; Atkin *v.* Young, 2 Jones 15. Wherever a chancellor would compel specific performance, the Orphans' Court is bound under the statute to decree it : McFarson's Appeal, 1 Jones 508. By a sale, as to the vendor the land is converted into personalty and the purchase-money is therefore assets in the hands of his personal representatives : Thompson *v.* Adams, 5 P. F. Smith 479. The plaintiffs were not bound in advance to remove any cloud that might by possibility be on their title : Dalzell *v.* Crawford, 1 Pars. 37 ; 1 Sugden on Vendors 400 ; Speakman *v.* Forepaugh, 8 Wright 363. The transaction between Manross and Brown was a mortgage : Colwell *v.* Woods, 3 Watts 188 ; Kerr *v.* Gilmore, 6 Id. 405 ; Reitenbaugh *v.* Ludwick, 7 Casey 131 ; Harper's Appeal, 14 P. F. Smith 315. The land was assets of Wallace & Brown : Lacy *v.* Hall, 1 Wright 360. Land held as partnership property is personalty : Meily *v.* Wood, 21 P. F. Smith 488 ; Abbott's Appeal, 14 Wright 234 ; Kramer *v.* Arthurs, 7 Barr 165. Brown's assignment to Wallace passed a perfect title to Wallace : Kenrick *v.* Smick, 7 W. & S. 41 ; Garver *v.* McNulty, 3 Wright 473 ; Ogden *v.* Brown, 9 Casey 247.

*J. M. Breden*, and *Dodd & Lee*, for defendant in error.—A decree in the Orphans' Court for specific performance is void unless there be notice to the heirs : McKee *v.* McKee, 2 Harris 231 ; Story's Eq. Plead., sect. 72, 160, 177 ; Anshutz's Appeal, 10 Casey 375 ; Sutter *v.* Ling, 1 Id. 466. The burden was on the plaintiffs to exhibit a good title : Negley *v.* Lindsay, 17 P. F. Smith 217 ; Hilliard on Vendors 221, 237, 210, 211. A purchaser will not be compelled to take a title which is not marketable : Speakman *v.* Forepaugh, 8 Wright 363 ; Swayne *v.* Lyon,

17 P. F. Smith 436.   Although this is a common-law action, it is governed by equitable principles : Fisher *v.* Worrall, 5 W. & S. 478 ; Colwell *v.* Hamilton, 10 Watts 413 ; Nicol *v.* Carr, 11 Casey 381.

Mr. Justice WOODWARD delivered the opinion of the court May 8th 1876.

The plaintiffs held only an equitable title to the tract of land which was the subject of the agreement between them and the defendant on the 15th day of October 1870, the date of its execution.   While a conveyance had been made to the West Hickory Mining Association by Dr. Gilbert and Mr. Nevin, yet the deed to those gentlemen, executed by William T. Neill and John Wilson on the 6th of January 1865, was held in escrow, a balance of purchase-money remaining unpaid.   This deed is not on the record, nor in the case, for, though read upon the trial, it was afterwards withdrawn by the plaintiffs.   In the interval between the date of the agreement and the tender of the conveyance by Mr. Brodie to the defendant, on the 31st of January 1861, a quit-claim deed dated on the 30th of January 1871, from Neill and Wilson and their wives to the plaintiffs, had been procured.   To meet an apprehended objection that the dower interest of the widow of Robert J. Brown was outstanding, a quit-claim deed from her to Neill and Wilson had been obtained on the 1st of November 1870. Under an arrangement with John Manross, Mr. Brown had received a conveyance of a body of lands, including the tract in controversy, and had entered into a written agreement, on the 5th of January 1856, to "make over" to Manross the title he held to these lands on payment of the consideration stipulated for in the agreement. In December 1864, on the petition of the administrators of Mr. Brown, then deceased, a specific performance of this agreement was decreed by the Orphans' Court of Venango county, and on the 17th of that month the administrators executed a deed in pursuance of the decree to Manross, from whom Neill and Wilson derived their title.

The most prominent question on the trial appears to have had relation to the adequacy of the proceedings in the Orphans' Court to transfer the interest of Mr. Brown in the land.   It was objected that notice was not given to his widow and heirs, and that the decree was therefore not final and conclusive against them. This view was adopted by the court.   The jury were told that the " proceedings of the Orphans' Court lay in the course of the plaintiff's title.   A purchaser entitled to an acceptable title is not bound to take one when the heirs of the former owner could bring an action and recover against the primâ facie title by showing that it never ought to have been made." The 15th section of the Act of the 24th of February 1834,

has provided that "whenever any person shall, by a bargain or contract in writing, bind himself to sell and convey any real estate in this Commonwealth, and shall die seised and possessed of such real estate, without having made any sufficient provision for the performance of such bargain or contract, it shall be lawful for the executors or administrators of such decedent, or for the purchaser of such real estate, or other person interested in such contract, to apply by bill or petition to the Orphans' Court having jurisdiction of the accounts of such executors or administrators, setting forth the facts of the case, and after due notice of such bill or petition to the purchaser, or to the executors or administrators and heirs of the decedent or devisees of such estate, as the case may require, to appear in such court on a day certain and answer such bill or petition ; if there be cause, such court shall have power, if the facts of the case be sufficient in equity, and no sufficient cause be shown to the contrary, to decree the specific performance of such contract, according to the true intent and meaning thereof." When the petition of the administrators of Mr. Brown was presented, the counsel for the respondent endorsed a written appearance confessing the facts set forth in the petition, and joining in the prayer of the petitioners. This was held by the court to be such notice as the circumstances of the case required. It was adequate if the words of the statute are applied in their plain and obvious sense. Three alternative directions are given—one of which is to be pursued as the facts of a particular case shall make it requisite and appropriate. In the first instance, purchasers; in the second, executors or administrators and heirs of a decedent, and in the third, executors or administrators of a decedent and the devisees of the estate are entitled to notice. No accepted principle and no rule of practice is infringed by this construction. By the execution of the contract the estate of the vendor is converted into personal property, and over that, for purposes of collection and administration, the personal representatives have absolute and unlimited control. And this construction is in exact accordance with both the letter and spirit of subsequent legislation. The Act of February 8th 1848 authorizes the executors or administrators of a deceased tenant in common to execute a deed for lands, sold by contract, in which he joined with his co-tenants in his lifetime, "where the surviving vendor or vendors desire to perfect the title," and where the executors or admintstrators shall be "satisfied with the performance by the purchaser or purchasers of the stipulations of such contract." The only condition required for the exercise of the authority thus conferred is, that the executors or administrators, before receiving the purchase-money, shall execute and file in the Orphans' Court a bond with security, to be approved by a judge of the court, for the faithful application of all moneys that shall be received under the provisions of this act. By the Act of April

9th 1849, an action of ejectment may be maintained by the executors or administrators of any decedent in their own names when the object is to enforce the payment of purchase-money due and owing on a contract for the sale of land. Notice to the heirs is requisite under neither of these statutes. Of the Act of 1849 it was said by the present Chief Justice, in Thompson v. Adams, 5 P. F. Smith 479, that it " applies only to the executor or administrator of the vendor, and is founded on the principle that, as to the vendor, the land is converted by the sale into personalty, and the purchase-money is, therefore, assets in the hands of the personal representatives. The executor or administrator having a right to sue for and receive the purchase-money, the legislature added the remedy against the land, to make his pursuit more effective." It has long been thoroughly settled that the widow and heirs of a decedent are not entitled to a specific notice of an application for an order of sale for the payment of debts : Murphy's Appeal, 8 W. & S. 169 ; Weaver's Appeal, 7 Harris 416 ; Wall's Appeal, 7 Casey 62 ; Stiver's Appeal, 6 P. F. Smith 9. It is apparent from this review that a rule which would interpolate into the Act of 1834 a requirement for notice to heirs of a petition by an executor or administrator for specific performance of a contract for a sale of land, would disturb the symmetry of principle that pervades the legislation by virtue of which estates of decedents are administered. It is not meant that any special mischief would flow from the introduction of such a rule, but to invite the interference of heirs in the settlement of the personal estates of decedents would establish a novel, awkward, and· incongruous practice.

While there are enough of dicta in the authorities to inspire some doubt, it is believed that the construction which the language of the statute contains is not inconsistent with any definitive judgment of this court. In McKee v. McKee, 2 Harris 231, the application was on behalf of the purchaser. No citation was issued, and no notice of the petition was given to either the legal or personal representatives of the decedent. A guardian ad litem was appointed at the time when the application was made. A commission was issued to examine witnesses, of which notice was given to the guardian, and under which the deposition of a single witness was taken. On the return of the commission, and one day after the taking of the deposition, the court made a decree adjudging the proof sufficient, and directed it to be certified. With all this the proceeding was in the Orphans' Court, which was authorized only to enforce specific performance, while the contract was proved and the decree made under the act regulating proceedings in the common-law courts. A record so made up could only be treated as absolutely void. Anshutz's Appeal, 10 Casey 375, decided that where both the vendor and vendee of real estate are deceased intestate, upon a proceeding in the Orphans' Court by the admin-

[West Hickory Mining Association *v.* Reed.]

istrator of the vendor to enforce the specific execution of the contract, the administrators and heirs of the vendee, and all persons deriving title under them or interested in the contract must be made parties. In concluding the opinion, Judge Read said, that "for security the heirs of the vendor must also be notified." The remark must be regarded as referring to the special duty required by the facts of the special case, for, in discussing the provisions of the Act of 1834, the judge had previously said : " The application may be by bill or petition by the executors or administrators of the decedent, or by the purchaser or other person interested in the contract. Due notice of such bill or petition is to be given in the first case to the purchaser, and in the second case to the executors or administrators and heirs of the decedent, as the case may require."

In Sutter's Heirs *v.* Ling, 1 Casey 466, specific performance of a contract had been decreed on the petition of the administrator of the vendor, and a conveyance in pursuance of the decree had been made to the vendee. Ejectment for the land was brought by the vendor's heirs, who claimed the right to recover on the single ground that they had not been made parties to the proceeding. The court below held, "that the application having been made by the administrator of the intestate, notice was not required to be given to the guardian or heirs, and that the deed to Landis (the vendee) conveyed a good title." The jury were accordingly instructed to return a verdict for the defendants. In affirming the judgment, Judge Lewis said : "The decree and the deed made in pursuance of it are primâ facie evidence for the purchaser, although the heirs of the vendee had no notice of them. The want of notice might entitle the heirs to go into evidence to show that the decree ought not to have been made. But nothing of the kind was attempted here. The justice of the decree is not in any manner impeached." It is a fact worthy of observation that the opinion did not refer to the Act of 1834 in even the remotest way. The principles relied on in the discussion of the case were almost exclusively derived from English equity authorities. The argument rested mainly on a doctrine that was stated in these words : "If either party to a contract die before completion, the equitable right to the land on the death of the vendee will pass to his devisee or heir, and the same right to the purchase-money on the death of the vendor will pass to his executors or administrators, for whom the heirs or devisees will be trustees :" 1 Jacobs & Walker, 499 ; 12 Simons 263 ; Adams's Equity 140 ; 2 Kent 477, n. *a ;* 2 Vernon 212 ; 1 Jarman on Wills 147 ; Sugden V. & P. 141." Surely a passing remark in an opinion in such a case, discussed on such grounds, cannot be seriously treated as an authority upon the construction of the Act of 1834.

Upon its face the title which the plaintiffs tendered to the de-

[West Hickory Mining Association *v.* Reed.]

fendants on the 31st of January 1871, was unobjectionable. Adequate provision had been made by the contract of the 9th of November 1870, for releasing the land sold to the defendants from the lien of the purchase-money unpaid; a conveyance had been obtained from Neill & Wilson, and the plaintiffs held the release of the dower of the widow of Robert J. Brown.

It was alleged at the trial that Mrs. Brown had been induced to execute this release by fraudulent representations made to her by Joseph A. Neill. This was a ground of defence set up against a title having all appearances of regularity. If the fact had been proved to the satisfaction of the jury that the instrument was void on the ground alleged, it would have established such a defect as would defeat the claim of the plaintiff on this branch of the case, undoubtedly. But it was still a question for the jury. The allegation was made against the written title and the parol evidence was introduced to overthrow it. The issue was presented in a form to make a trial and decision by the jury indispensable.

There are other aspects in which it is necessary that this cause should be considered. While the deed from James Hulings to Robert J. Brown was absolute in its terms, it was alleged by the plaintiffs that it was in reality a mortgage, and was held to secure advances made by Brown to John Manross out of the firm of Wallace & Brown. The contract already referred to, of the 5th of January 1856, contained a stipulation that Brown should transfer to Manross the titles he held under the deeds from Hulings and others on the delivery by Manross of 560,000 feet of lumber. On the 28th of August 1856, the firm of Wallace & Brown was dissolved, and all the interest of Brown in the partnership assets and credits was assigned to Wallace. In the inventory of these assets and credits, the claim against Manross was included. The item was, "Due on Manross place $5000." The agreement contained this provision: "All the real estate of every kind also to be delivered up without delay to said Wallace, and the deeds and titles made out in his name." On the 26th of November 1864, a deed to Manross for the lands described in the agreement of the 5th of January, was executed and delivered by Wallace and his wife. In addition to the documentary evidence, Alexander Wallace was called as a witness. He testified as follows: "I knew the property belonging to Manross that Wallace & Brown had a claim on. It was a partnership property. Wallace & Brown had furnished Manross supplies and built him a saw-mill. He gave the property as security, and when they were paid the property was to go back to Manross. No other funds than those of the firm. Land was bought from Hulings with partnership funds, as I understand from Brown. There was about $5000 against Manross. I understood Brown that as soon as the property was paid for, Manross was to have it back." Mrs.

30 P. F. SMITH—4

Brown said in her deposition, "I was entirely ignorant at the time (of the execution of the release of dower) that I had any legal title or claim whatever as the widow of Robert J. Brown in the land, supposing that said land had been sold by the firm of Wallace & Brown, and the firm having been dissolved." The conveyance by Hulings to Brown was made on the 15th of August 1854, and the contract between Brown and Manross was not entered into until between sixteen and seventeen months afterwards, and in order to make the transaction a mortgage, the agreement for defeasance must have been contemporaneous with the execution of the deed. "Whenever there is in fact an advance of money to be returned within a specified time on the security of an absolute conveyance, the law converts it into a mortgage, whatever may be the form adopted, or whatever may be the understanding of the parties:" Harper's Appeal, 14 P. F. Smith 315. If the actual contract was legally a mortgage, the assignment by Brown of his interest in the firm assets transferred his claim to this land, and the subsequent conveyance by Wallace to Manross amounted to satisfaction. There was evidence on which the jury might have been justified in finding that Brown took the conveyance from Hulings merely as security for the advances of his firm to Manross.

The question should have been submitted to the jury also, whether, under all the evidence, the lands which Hulings conveyed to Brown were partnership property. If they were, while the statutory form of transfer would be still required, they became stamped with all the characteristics of the other assets of the firm, as to all purposes of management and control, all incidents of lien, and all qualities of title and estate. It was held in Kramer *v.* Arthurs, 7 Barr 165, that, when land is brought into a concern as stock, it is, as between partners and a person who has knowingly dealt with one of them for it, to be treated as personal estate belonging not to the partners individually, but to the company collectively. One partner of a firm engaged in distilling, bought a lot adjoining their distillery, with the intention of using it for business purposes, paying for it money of the firm, but taking title in his own name. The lot was not used as intended. Upon distribution of the proceeds of the sale of the lot, it was held that it was partnership property; that the partners were not tenants in common; and that the decree of the court awarding the proceeds to the judgment of an individual creditor of one of the firm was error: Erwin's Appeal, 3 Wright 535. The same principle was applied in Abbott's Appeal, 14 Wright 234, and Meily *v.* Wood, 21 P. F. Smith 488. So far as partners and their creditors are concerned, real estate belonging to the partnership is in equity treated as mere personalty, and governed by the general principles of the latter, and so it will be deemed in equity to all other intents and purposes, if the partners themselves have purposely impressed

[West Hickory Mining Association *v.* Reed.]

upon it the character of personalty : Story on Partnership, § 93. If the transaction between Brown and Manross was in substantial effect a mortgage, or if the lands were held by Wallace & Brown as partnership assets, the question arising upon the release of dower by Mrs. Brown could have no real significance.

The objection to the admission of the record of the suit brought in Forest county by Neill & Wilson against the Mining Association had no substantial foundation. The evidence was perhaps of no special importance, but the suit was referred to in the agreement of the 9th of November 1870, which the plaintiffs had shown, and that made it technically admissible. The facts disclosed by the depositions of Joseph B. Stone and Mrs. Brown were relevant. Some of the interrogatories may have been objectionable as embodying material facts, as capable of a simple affirmative or negative answer, and as indicating the answer at the same time. But the error has not been properly assigned. The admission of the depositions was resisted on the trial on account of what was called "the leading interrogatories and answers thereto," to which objections had been filed before the testimony was taken. The same words have been used in the specification of the alleged error. General references to documents and entries scattered through a record are not a compliance with the rules. The specific items objected to ought to be embodied in the assignment.

Judgment reversed, and a *venire facias de novo* awarded.